IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CLARA ELIZABETH BEASLEY,

      Plaintiff,

v.

NANCY A. BERRYHILL, *Acting Commissioner of Social Security*,[1]

      Defendant.

CIVIL ACTION FILE NO.

1:16-cv-3041-WSD-JKL

## FINAL REPORT AND RECOMMENDATION

This case is before the Court on Plaintiff Clara Elizabeth Beasley's suit challenging the denial of her application for supplemental security income by the Defendant Acting Commissioner of Social Security Administration ("Commissioner"). The sole issue before the Court is whether the Administrative Law Judge ("ALJ") provided "good cause" for discounting the opinion of Beasley's treating psychiatrist, Angel Luis Perez, M.D. After careful consideration

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. In accordance with the last sentence of 42 U.S.C. § 405(g) and Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this action.

of the record and the parties' briefs, I conclude that substantial evidence supports the ALJ's articulation of good cause for discounting the weight he accorded to Dr. Perez's opinion.   I therefore **RECOMMEND** that the decision of the Commissioner be **AFFIRMED**.

## I.   PROCEDURAL HISTORY

On December 18, 2012, Beasley applied for supplemental security income, alleging a disability onset date of May 15, 2000.  (Tr. 268.)  The application was denied initially and upon reconsideration.  (Tr. 196-97.)  Beasley had a hearing before an ALJ on January 14, 2015.  (Tr. 150-82.)  On February 18, 2015, the ALJ issued an unfavorable decision finding that Beasley was not disabled.  (Tr. 133-44.)  Beasley requested review of the hearing decision, and on June 24, 2016, the Appeals Council denied the request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 5-8.)  Beasley then filed the instant civil action seeking review of the Commissioner's denial of benefits.

## II.   STANDARD OF REVIEW AND FIVE-PART ANALYSIS

This Court must review the Commissioner's decision to ensure that it is supported by substantial evidence and is based upon the proper legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011).  Substantial

evidence is "more than a scintilla, but less than a preponderance." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). Specifically, substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Winschel*, 631 F.3d at 1178 (quotation omitted). The Court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]," even if the evidence preponderates against the Commissioner's decision. *Bloodsworth*, 703 F.2d at 1239.

Under the regulations promulgated by the Commissioner, the ALJ must follow a five-step sequential analysis when evaluating a disability claim. 20 C.F.R. § 416.920(a). That analysis is as follows:

1. The ALJ first determines whether the applicant is currently working; if so, the claim is denied.

2. The ALJ determines solely on the basis of the medical evidence whether the claimed impairment is "severe"; that is, an impairment or combination of impairments which significantly limits the claimant's physical or mental ability to do basic work activities; if not, the claim is denied.

3. The ALJ decides, again, only using medical evidence, whether the impairment equals or exceeds in severity certain impairments described in the Commissioner's Listing of Impairments; if it does, the claimant is automatically entitled to disability benefits.

4. The ALJ considers whether the applicant has sufficient RFC, defined as what an individual "can still do despite his limitations," to perform the claimant's past work; if so, the claim is denied.

3

    5.  The ALJ decides, on the basis of the claimant's age, education, work experience, and RFC, whether the claimant can perform any other gainful and substantial work within the economy.

20 C.F.R. § 416.920(a)(4).

The claimant has the burden of proof during the first four steps. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). At the fifth step, the burden shifts to the Commissioner to demonstrate that there are jobs within the economy that the claimant can perform. *Id.* If the Commissioner makes that showing, then the burden shifts back to the claimant to prove that he is unable to perform those jobs. *Id.*

## III.   RELEVANT BACKGROUND EVIDENCE

Beasley was 44 years old at the time of the ALJ's unfavorable decision and 30 years old at the time of her alleged disability onset. (Tr. 144, 341.) She graduated high school, taking special education classes. (Tr. 171, 426, 649.) She previously worked at a wood plant, a grocery store, and a fast-food restaurant. (Tr. 295.)

On February 27, 2013, at the request of the Social Security Administration, Plaintiff was evaluated by consultative psychologist Cheryl A. Gratton, Ph.D. (Tr. 426-30.) At the evaluation, Dr. Gratton interviewed Beasley and Beasley's roommate's sister, Lynette Bailey, who accompanied her to the evaluation. (Tr.

4

427-428.)   Dr. Gratton extensively summarized the interviews in her report. Briefly, Beasley reported to Dr. Gratton that she is unable to work because she has "been slow all her life" and is "unable to read," although she can read simple words like "cat" and "dog."  (Tr. 426, 427.)  Beasley also reported that she can structure and execute her daily routine, which includes eating breakfast, cleaning up, watching television, sitting outside with her puppy, napping, eating lunch, sitting outside, and having a quiet day at home.  (Tr. 427.)  She stated that her hobbies include watching television, working on "puzzle books," and spending time with the puppy.  She also walks the dog for exercise.  She reported that she can do housework and mow the lawn but that the results are imperfect.  She does not cook, explaining that someone has always cooked for her.  She can make simple meals, however.  (Tr. 428.)  She can bathe and dress herself and attend to grooming.  (Tr. 427.)  She does not shop for groceries and stated that she has never done so in the past.  She also stated that she does not know how to do laundry.  (*Id.*)

Beasley described her mood as "happy."  (Tr. 427.)  She reported that when she was younger she would experience auditory hallucinations in which her deceased mother would speak to her, and Beasley would respond.  She occasionally has nightmares, including about her mother, who committed suicide by gunshot in

Beasley's presence.  She reported that she takes medication for bipolar disorder but that she did not know the name of the medication and did not bring it with her to the interview.  (*Id.*)

Dr. Gratton conducted a mental status examination, which revealed that Beasley's articulation was poor, and her speech was characterized by a heavy regional dialect.  (Tr. 428.)  There were no obvious behavioral anomalies apart from malingering in the testing portion of the evaluation.  Her intelligence appeared to be slightly, but not significantly, below average during conversational speech.  (*Id.*)  Her speech was "fluent, prosodic, and free from paraphasic errors."  (Tr. 429.)  Dr. Gratton noted that Beasley described a history auditory hallucinations that was "poorly substantiated."   Dr. Gratton described Beasley's thought processes as "logical and coherent" and her rate of mentation was normal.  Dr. Gratton noted that Beasley was unable to comprehend abstraction, she was not oriented as to time, place, or personal information, her aspects of memory functioning appeared impaired, and her speed at task performance was deficient.  But Dr. Gratton also observed that the severity of those limitations was dubious because Beasley put forth only minimal effort during the examination.  (*Id.*)

On WAIS-IV testing, Beasley obtained a full-scale IQ of 52.  (Tr. 429.)  Dr. Gratton noted that Beasley did not appear to be motivated to do well on the assessment and appeared to put forth only minimal or inconsistent effort; thus, the results likely slightly underestimate Beasley's overall functioning.  (*Id.*)  Dr. Gratton also noted that a test for malingering clearly indicated that she was malingering.  (Tr. 430.)

Dr. Gratton diagnosed Beasley with malingering and assigned her a GAF score of 65.[2]  (Tr. 430.)  Dr. Gratton summarized her findings as follows:

> [Beasley's] IQ is in the Defective range, but frank and flagrant malingering during testing indicates that this is an under-estimate of her actual level of functioning.  The psychometrist actually asked Ms. Beasley aloud if anyone had coached her to perform poorly because her malingering was so apparent. She denied this, but it is certainly plausible that [Bailey] or her roommate may have coached her to do poorly.  Based on the results of this assessment, she finds it generally easy to comprehend and carry out simple instructions.  She is not likely to be challenged by difficulties getting along with others.  Her attention is sufficient for the execution of her day-to-day activities.   She would not be likely to

---

[2] Global Assessment of Functioning or "GAF" is a numerical measurement of an individual's overall functioning "with respect only to psychological, social, and occupational functioning" using a 1 to 100 point scale.  *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32-34 (4th ed. text rev. 2000) ("DSM IV"); *see Kent v. Acting Comm'r of Soc. Sec. Admin.*, 651 F. App'x 964, 966 n.4 (11th Cir. 2016).

7

> decompensate under stressful conditions.  Her attention
> is such that timely completion of tasks and assignments
> would not prove difficult.  She is capable of self-
> management of disability fund, if awarded, as best can be
> determined.

(Tr. 430.)

The following month, on March 25, 2013, Beasley underwent a consultative physical examination with Tiffany S. Lee, M.D., at the request of the Social Security Administration.  (Tr. 432-34.)  An unidentified "friend" accompanied her to the examination.  (Tr. 432.)  Pertinent to Beasley's mental impairments, Beasley reported having difficulty with short and long-term memory, mood swings one to two times a day, hearing voices, and depressive feelings and mood.  (Tr. 432.)  She reported that she had been diagnosed with mental retardation in 2013 and was prescribed medication, but that she did not follow up with a mental health provider because her physician was arrested.  (*Id*.)  Dr. Lee's examination indicated that Beasley was alert and oriented, she did not appear depressed or anxious, her mood and affect were appropriate, and her grooming was appropriate, and there was no evidence of memory problems.  (Tr. 434.)

On September 18, 2014, Beasley presented to the DeKalb County, Georgia, Community Service Board ("DeKalb CSB") in Decatur, Georgia, and was interviewed by a social worker.  (Tr. 526, 544-45.)  Beasley reported that she was

seeking to resume treatment for anxiety and hallucinations, and that she had been experiencing symptoms of anxiety, including increased heart rate, poor sleep, irritability, flashbacks two to three times per week, intrusive thoughts, and waking up afraid. (Tr. 544.) She also reported hearing voices in her head, and her sister-in-law (presumably Bailey) stated that she is often heard Beasley talking and laughing to herself and having elaborate conversations with "someone." Beasley reported no substance abuse, legal problems, or health problems, except that she had mild depression at times. The social worker scheduled Beasley for an assessment at the DeKalb CSB's Clifton Springs Mental Health Center ("Clifton Springs"). (*Id.*)

On September 23, 2014, Beasley presented to Clifton Springs, and social worker Natasha Colvin performed a mental health assessment. (Tr. 547.) Beasley stated that she wanted to deal with issues from her past and recounted traumatic events from her childhood, including being in and out of foster care, enduring molestation by "boys in foster home," abuse by her mother, and, when she was four years old, her mother's suicide. (Tr. 546, 578-79.) She also reported depression, crying, irritability, and problems sleeping but denied current suicidal or homicidal ideations. (Tr. 546.)

Also on September 23, 2014, Beasley underwent a psychosocial assessment with Dr. Perez.  (Tr. 633, 650-656.)  During the evaluation, Beasley reported that she had been on medications before and felt that they were not working well, but she could not recall which mediations she was taking.  (Tr. 651.)  She reported "extensive traumatic [history] when she was young" but did not wish to speak of it.  She stated that she would have nightmares and flashbacks three to four times per week.  She also stated that when she was a teenager she began to experience hallucinations telling her to hurt herself and others but that she never acted on the commands.  She reported that she had been feeling depressed since she was a teenager.  She described her motivation and energy as low, frequent crying spells, and feelings of guilt, worthlessness, and hopelessness.  Her sleep and appetite were "fair."  Her symptoms caused her to be "very anxious, almost panicky."  (*Id.*)

Dr. Perez diagnosed Beasley with major depressive disorder, recurrent, severe with psychotic features, posttraumatic stress disorder, and mild mental retardation, and assessed her with a GAF score of 54.[3]  (Tr. 633-34.)  He also prescribed Zoloft to help with depression, anxiety, and traumatic symptoms, and

---

[3] A GAF score between 51 and 60 indicates "Moderate symptoms" or "moderate difficulty in social, occupational, or school functioning."  DSM-IV at 34.

Abilify to help with hallucinations and delusions.  (Tr. 653.)  He recommended Beasley to continue with intensive outpatient services for at least six months with Ms. Colvin.  (Tr. 617, 653.)

On October 2, 2014, Beasley returned to Clifton Springs for an individual psychotherapy session with Ms. Colvin.  (Tr. 619-21.)  Ms. Colvin noted that Beasley was alert and oriented, that she reported her feelings as "very good," and that she was feeling "a lot better" with medication.  (Tr. 619-20.)  Ms. Colvin assessed Beasley as alert and oriented, with good judgment, good insight, normal mood, and normal affect. (Tr. 619-20.)  Her thoughts were goal-oriented with good eye contact and verbal communication.  (Tr. 620.)  Beasley denied any suicidal or homicidal ideations, hallucinations, or delusions.  (*Id.*)

On October 16, 2014, Beasley attended a psychotherapy session with Ms. Colvin.  (Tr. 622-23.)  Beasley's assessment was generally normal, except that Ms. Colvin noted that Beasley was tearful when talking about her past.  (Tr. 623.)  Beasley also reported "daily activity outside of the home." (*Id.*)  On October 16, in a clinical report, Dr. Perez repeated his diagnoses of major depressive disorder, recurrent, severe with psychotic features, posttraumatic stress disorder, and mild mental retardation, and again assessed her with a GAF score of 54.  (Tr. 635.)

11

On October 31, 2014, Beasley again attended a psychotherapy session with Ms. Colvin.  (Tr. 534-35.)  Beasley's assessment was generally normal, except that she reported audio hallucinations of hearing a friend call her name.  (*Id.*)  Beasley reported that she would cope by walking her dog, sitting on the porch, and "doing puzzle books."  (Tr. 534.)  She also reported reduced crying spells and daily journaling of her thoughts and feelings.  (Tr. 535.)

On December 2, 2014, Dr. Perez again diagnosed Beasley with major depressive disorder, recurrent, severe with psychotic features, posttraumatic stress disorder, and mild mental retardation, and assessed her with a GAF score of 54. (Tr. 637-38.)

On December 12, 2014, Beasley returned to Clifton Springs and attended therapy with Ms. Colvin.  (Tr. 628.)  In a clinical report, Ms. Colvin noted that Beasley's coping skills and calming strategies included walking and puzzles.  (Tr. 665.)

On December 23, 2014, Dr. Perez completed a medical evaluation form in which he reported that Beasley was suffering from "depressive syndrome" characterized by anhedonia, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, and

hallucinations, delusions, or paranoid thinking.  (Tr. 667-70.)  Dr. Perez indicated that Beasley had marked limitations in her activities of daily living, maintaining social functioning, and her concentration, persistence or pace, which resulted in her inability to complete tasks in a timely manner.  (Tr. 669.)  Dr. Perez also reported that Beasley had four or more repeated episodes of decompensation, each of extended duration.  (*Id.*)

Dr. Perez additionally reported that Beasley had a "[m]edically documented history of chronic affective disorder of at least 2 years' duration that has caused more than minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support."  (Tr. 669.) He further indicated that Beasley had "[a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause [her] to decompensate." (*Id.*)

Dr. Perez described Beasley's functional limitations as follows:

> Due to [Beasley's] traumatic and depressive symptoms [she] has decreased functionality in several areas of her life including occupational, socially and taking care of herself.

13

(Tr. 670.)  To support of his findings, Dr. Perez explained that Beasley had a long history of mood and traumatic symptoms with fair prognosis with adequate treatment.  Dr. Perez further opined that Beasley would be unable to engage in gainful employment.  (*Id.*)

On January 14, 2015, Beasley and Bailey appeared and testified before the ALJ.  (Tr. 150-83.)  Beasley testified that she completed the twelfth grade through a special education program.  (Tr. 157-58.)  She stated that she can read but is limited to simple words. (Tr. 158.)  She can count change but cannot do more advanced mathematics.  (*Id.*)  She testified that she cannot do household chores without assistance from Bailey.  (Tr. 159.)

Beasley testified that she is not depressed "very often" and feels depressed two to three times per week. (Tr. 162.)  She believes that her depression is triggered when she thinks back to traumatic events that occurred during her childhood.  She reported nightmares two to three times per week.  (*Id.*)  She also testified that starting around four years earlier, she started hearing voices inside her head, and that the voices have worsened overtime.  (Tr. 162-63.)  The voices in her head aggravate her and affect her ability to do things. (Tr. 164.)  Beasley reported that she had been taking medication for approximately four months that helped with the

14

voices in her head, so that they would occur only two to three times per week for approximately 20 minutes.  (Tr. 164-65.)

Bailey testified that Beasley has lived with her since 2006.  (Tr. 167.)  Bailey works as a home health care provider.  (Tr. 168.)  Beasley accompanies her to work and helps her by performing light tasks.  (Tr. 168-69.)  Bailey testified that she cannot leave Beasley unattended and gave an example of an instance where Beasley left a stove unattended. (Tr. 169-70.)  Bailey stated that Beasley can prepare simple meals, such as making a sandwich, but cannot prepare food using a knife because her hand is shaky.   (Tr. 170.)  Bailey testified that she would help Beasley with personal hygiene and her brother would help with clothing.  (Tr. 173.)  She also described Beasley's attention span as "short . . . like a child" and that she has difficulty completing household chores.  (Tr. 173-74.)

## IV.   THE ALJ'S UNFAVORABLE DECISION

ALJ found that Beasley had the severe impairment of mild patellofemoral degenerative changes of the right knee but that Beasley's medically determinable mental impairments of depressive disorder, posttraumatic stress disorder, personality disorder, and substance dependence, were nonsevere as they did not cause more than minimal limitation on her ability to perform basic mental work

15

activities.  (Tr. 135.)  The ALJ also found that she did not have an impairment or combination of impairments that met or medically equaled a listing.  (Tr. 136.)

The ALJ concluded that Beasley had the RFC to perform light work except that she (1) could stand and walk for up to a total of 4 hours and sit for up to 6 hours in an 8-hour workday; (2) could only occasionally climb ramps, stairs, ladders, ropes, and scaffolds; (3) could only occasionally stoop, kneel, crouch, and crawl; (4) could only frequently balance; (5) should avoid concentrated exposure to hazardous such as unprotected heights; and (6) could only frequently push/pull with the right lower extremity.  (Tr. 137.)

In assessing the RFC, the ALJ gave "little weight" to Dr. Perez's opinions set forth on the "medical evaluation" form.  (Tr. 142.[4])  The ALJ explained that Dr. Perez's opinion that Beasley was disabled and possessed marked limitations in functioning were contrary to the objective medical evidence.  The ALJ observed that Dr. Perez found that Beasley had marked limitation in functioning, but that Beasley reported "very broad activities of daily living, social functioning and in

---

[4] In discussing Dr. Perez's opinion, the ALJ simultaneously discussed a similar opinion of Ms. Colvin, the social worker at Clifton Springs.  (*See* Tr. 611.) Beasley does not appeal the ALJ's consideration of Ms. Colvin's opinion; thus, the Court addresses only Dr. Perez's opinion.

16

concentration, persistence and pace."  The ALJ also noted that Beasley reported that she was limited by psychological impairments, but Dr. Perez's assessments of her included "little to no deficits."  This indicated that Beasley's subjective complaints, rather than the medical findings of Dr. Perez, "were relied upon in finding the claimant disabled."  With regard to Dr. Perez's finding that Beasley was disabled, the ALJ noted that "whether an individual is 'disabled' or whether their residual functional capacity prevents them from doing past relevant or any other work is an administrative finding that is dispositive of a case; i.e. a finding that would direct the determination or decision of disability."  The ALJ considered Dr. Perez's remaining findings and concluded that "the assessment that [Beasley] had marked functional limitations and was disabled not only is contrary to the longitudinal record, but is internally inconsistent with [Dr. Perez's] own progress notes."  The ALJ went on to state that Beasley argued during the administrative proceedings that she met a Listing based on Dr. Perez's assessment, but that the argument was "unsupported by the record which showed the claimant to be malingering."  (*Id.*)

The ALJ next found that Beasley did not have any past relevant work, but considering Beasley's age, education, work experience, and RFC, jobs existed in

17

significant numbers in the national economy that she could perform.  (Tr. 143-44.)
Accordingly, the ALJ concluded that Beasley was not disabled since December 18,
2012 and February 18, 2015, the date of the decision.  (Tr. 144.)

## V.    DISCUSSION

For disability benefits claims filed before March 27, 2017, the ALJ must
evaluate medical opinion evidence in accordance with the factors in 20 C.F.R.
§ 416.927(c).  *See also Tauber v. Barnhart*, 438 F. Supp. 2d 1366, 1376-77 (N.D.
Ga. 2006).  Those factors include whether the physician examined the patient, the
evidence presented in support of the opinion, the physician's specialty, and the
consistency of the opinion with the record as a whole.  20 C.F.R. § 416.927(c).  A
treating physician's opinion generally is entitled to more weight.  *Id.*
§ 416.927(c)(2).  When the treating physician's opinion is well-supported by
clinical and laboratory diagnostic techniques and is not inconsistent with the other
substantial evidence in the record, the ALJ should give the opinion controlling
weight.  *Id.*

An ALJ must clearly articulate good reasons for discounting the opinion of
a treating physician.  *Winschel*, 631 F.3d at 1179; *Phillips v. Barnhart*, 357 F.3d
1232, 1240-41 (11th Cir. 2004).  Good cause for discounting a treating physician's

opinion exists when the physician's opinion was not bolstered by the evidence, the record supports a contrary finding, or the physician's opinion was conclusory or inconsistent with the physician's own medical records. *Hunter v. Soc. Sec. Admin., Comm'r*, 808 F.3d 818, 823 (11th Cir. 2015), *cert. denied* 136 S. Ct. 2487 (2016); *Phillips*, 357 F.3d at 1240-41. The Eleventh Circuit has held that "[t]he Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error." *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).

Beasley first argues that the ALJ failed to provide "good cause" for discounting Dr. Perez's opinion because Dr. Perez's opinion was not "contrary to the objective medical evidence," as the ALJ found. [Doc. 13 at 18-19.] Specifically, Beasley points to (1) school records that indicated that she received "special services" and only received a certificate at graduation rather than a diploma; (2) Dr. Gratton's observation that Beasley's "articulation was poor and her speech was characterized by a heavy regional dialect"; (3) Dr. Perez's statement that she had a "constricted" and "tearful" affect and felt sad; and (4) an observation by a physician at Grady Hospital that Beasley appeared to be mildly developmentally delayed." [*Id.* at 18-19 (citing Tr. 428, 466, 487, 564).]

19

The Court finds Beasley's argument unpersuasive, and readily concludes that substantial evidence supports the ALJ's conclusion that Dr. Perez's opinion was contrary to objective medical evidence.  Treatment notes from Clifton Springs, where Dr. Perez treated Beasley, consistently reflect that Beasley was well-oriented, and had good insight, normal affect, normal mood, and goal-oriented thoughts during the entire three-month period during which she was treated there. (*See* Tr. 620, 623, 625, 639.)  Likewise, Dr. Gratton's comprehensive evaluation indicated that Beasley displayed "frank and flagrant malingering during testing" and noted that the findings of the mental status evaluation were not entirely accurate because Beasley put forth minimal effort.  (Tr. 430.)  Dr. Lee likewise noted that Beasley was alert and oriented, that she did not appear depressed or anxious, that her mood and affect were appropriate, that she was groomed appropriately, and there was no evidence of problems with memory.  (Tr. 434.) The evidence that Beasley cites in her brief do not compel a different result. Essentially, Beasley is asking the court to re-weigh the evidence, which is something that this Court may not do.  *See Bloodsworth*, 703 F.2d at 1239.

Beasley next argues that the ALJ understated her limitations with activities of daily living, social function, and concentration, persistence, and pace.  [Doc. 13

at 19.]  Specifically, she contends that the ALJ's statement that Beasley had an "extremely wide" range of daily activities including "handling her personal care needs, going shopping, going to church, doing work puzzles and playing cards, watching a variety of television shows and doing various chores" is not supported by the record.  [Doc. 13 at 19-20 (citing Tr. 141).]  She points to Bailey's testimony that Beasley could not be left alone, that she received help with personal hygiene and dressing, that her attention span was very short, and that she tried to do household chores, but had difficulty completing them.  [*Id.* at 20 (Tr. 173-74.)  Beasley also cites her own reports to Dr. Gratton, the consultative examining psychologist, that she was not permitted to use the stove or oven, that she did little housekeeping due to lack of coordination, needed reminders to bathe, did not know how to launder clothes, did not know how to drive, did not independently shop for groceries, and did not have experience with paying bills or managing her finances.  [*Id.* (citing Tr. 428).]  Beasley additionally points to her function report, in which she reported tried to sweep, dust, feed her dog, retrieve the mail and the newspaper; that she did not go out alone; that she did not shop by herself; and that she needed someone to accompany her for social activities.  [*Id.* (citing Tr. 327-29).]  She also reported that she had difficulty bathing, dressing herself, caring for her hair, and

21

walking; that she could not use a knife while eating because she might harm herself; and she received help with hygiene and grooming.  [*Id.* (citing Tr. 326-27.]

This argument is also without merit because Beasley merely points to evidence that tends to support her position and essentially asks the Court to reweigh the evidence.  The Court's review of the ALJ's findings is limited to whether they are supported by substantial evidence, and here, substantial evidence supports the ALJ's findings.  Beasley reported in her function report and during her examination with Dr. Gratton that she attended to her personal hygiene and grooming, that she watches television programs for a majority of the day (including game shows, courtroom dramas, talk shows, and the news), works on word puzzles, does light housework, prepares simple meals, and goes shopping.  (Tr. 324-29, 427-28.) Thus, Beasley's own reports of her activities support the ALJ's assessment that she can perform a very wide range of daily activities.  *See Phillips*, 357 F.3d at 1241 (finding substantial evidence supported the ALJ's decision to give little weight to a treating physician's opinion that conflicted with his treatment notes and the claimant's admitted daily activities).

Beasley next argues that the ALJ unfairly speculated that Dr. Perez's opinion relied more on Plaintiff's subjective complaints rather than his own findings, and,

22

thus, inappropriately substituted his own lay opinion for that of Dr. Perez.  [Doc. 13 at 21.]  Beasley further argues that it is inappropriate for an ALJ to discount a treating physician's opinion on the basis that it relies on subjective reports.  [*Id.*]

Beasley's contention that the ALJ substituted his own lay opinion for the opinion of Dr. Perez is without merit.  For starters, an ALJ may properly consider a treating source's reliance on the claimant's subjective complaints to discount the source's opinion.  *See Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159 (11th Cir. 2004); *see also Womble v. Comm'r of Soc. Sec.*, __ F. App'x __, 2017 WL 3727397, at *4 (11th Cir. Aug. 30, 2017) (substantial evidence supported ALJ's decision discounting weight accorded to treating physician).  The regulations in effect at the time of the ALJ's decision authorized an ALJ to consider the supportability of a treating source's opinion, including the extent to which the source "presents relevant evidence to support an opinion, particularly medical signs and laboratory findings."  20 C.F.R. § 416.927(c)(3).[5]  In addition, the ALJ's conclusion that Dr. Perez relied on Beasley's subjective complaints is supported by

---

[5] Plaintiff's reliance on *Davis v. Barnhart*, 377 F. Supp. 2d 1160, 1164 (N.D. Ala. 2005), is misplaced.  [*See* Doc. 13 at 21.]  In that case the ALJ gave no explanation as to why he did not credit a treating source's opinion, whereas here, the ALJ considered the supportability of Dr. Perez's opinion and specifically explained why he questioned the basis for the opinion.

the record.  Dr. Perez's opinion makes no reference to his clinical notes or those of Ms. Colvin, and in determining that she has marked limitations, he relies only on Beasley's traumatic personal history and history of depressive symptoms.  The ALJ found that Beasley was not entirely credible in her subjective reports, and Beasley does not challenge that finding on appeal.  (Tr. 138.)  Because Dr. Perez's opinion appears to be based on Beasley's subjective complaints, which the ALJ found to be less than credible, substantial evidence supports the ALJ's decision to discount the weight given to Dr. Perez's opinion.

Beasley's final argument is that the ALJ erroneously concluded that Dr. Perez's opinion was not inconsistent with his own clinical notes.  [Doc. 13 at 22.] Specifically, Beasley points out that Dr. Perez identified numerous symptoms that Beasley reported, and that he diagnosed her with major depressive disorder, PTSD, and mild mental retardation, assessed her with a GAF score of 54, and prescribed Zoloft and Abilify.  She also points out that Dr. Perez reiterated those diagnoses and GAF assessment on October 16 and December 2, 2014.  [*Id.*]  She further argues that the ALJ erred in giving the GAF scores little weight because the GAF scores reflect severe impairments and supported Dr. Perez's opinion.  [*Id.* at 22-23.]

Beasley's argument misapprehends the ALJ's decision.  The ALJ did not merely state that Dr. Perez's opinion was inconsistent with his own clinical records.  Rather, the ALJ noted that Dr. Perez's opinions were inconsistent with the progress notes of the "professionals" at Clifton Springs—*i.e.*, Dr. Perez and Ms. Colvin. Substantial evidence supports the ALJ's conclusion.  As discussed above, the progress notes showed that Beasley's mental evaluations were generally unremarkable and that she was not as limited as Dr. Perez opined.

Nor did the ALJ err in giving little weight to the GAF scores in the record. A GAF score, standing alone, does not constitute evidence of a disability because a GAF score does not indicate functional limitations.  As the Eleventh Circuit has explained:  "[I]t is important to note that the Commissioner has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" *Lacina v. Comm'r, Soc. Sec. Admin.*, 606 F. App'x 520, 527 (11th Cir. 2015) (quoting Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50764-65); *see also Williams v. Comm'r, Soc. Sec. Admin.*, 580 F. App'x 732, 734 (11th Cir. 2014) (recognizing that a claimant's GAF score is not dispositive when determining

25

disability).  Accordingly, the Court finds no error in the ALJ's decision to give less weight to the GAF score.

Moreover, a GAF score of 54 undermines Dr. Perez's opinion regarding Plaintiff's limitations.  A GAF score for 51-60 indicates moderate symptoms, such as occasional panic attacks or moderate difficulty in social, occupational, or school functioning.  *See* DSM-IV at 34.  Dr. Perez opined, however, that Plaintiff had marked—not moderate—limitations in areas of activities of daily living, maintaining social functioning, and concentration, persistence and pace. *See Ward v. Astrue*, 286 F. App'x 647, 650 & n.1 (11th Cir. 2008) (holding that GAF score of 60 did not support conclusion that claimant's depression was a severe impairment because the score only indicates "moderate symptoms OR any moderate difficulty in social, occupational, or school functioning").  Given this inconsistency, even if the ALJ had given greater weight to the GAF score, it would not have changed his ultimate conclusion that Dr. Perez's opinion was entitled to little weight.[6]

_____

[6] Beasley does not mention that Dr. Gratton also assessed her with a GAF score of 65.  A GAF score between 61 and 70 indicates "Some mild symptoms" or "some difficulty in social, occupational, or school functioning," but "generally functioning pretty well" and "ha[ving] some meaningful interpersonal relationships."  DSM-IV at 34.  This score, to which the ALJ gave "little weight,"

In sum, I conclude that the ALJ cited good reasons for giving Dr. Perez's opinion less than controlling weight, and substantial evidence supports the ALJ's assessment of Dr. Perez's evaluation.

## VI.    CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**.

IT IS SO RECOMMENDED this 24th day of October, 2017.

_____
JOHN K. LARKINS III
United States Magistrate Judge

_____

is also inconsistent with Dr. Perez's opinion and bolsters the ALJ's decision to discount Dr. Perez's opinion.